UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRUCE K. SIDDLE and SANDRA K. ) <br> SIDDLE, individually and as trustees of the ) <br> Bruce K. Siddle and Sandra K. Siddle trusts, ) <br> dated July 16, 2003, and PPCT ) <br> MANAGEMENT SYSTEMS, INC., ) <br>   ) <br>   Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> DOCTOR R. CRANTS, JR., DOCTOR R. ) <br> CRANTS, III, LINDA COOPER, ) <br> GEORGE V. CRAWFORD, III, LEE F. ) <br> BOOTH, and ROY W. OAKS, ) <br>   ) <br>   Defendants. ) | Case No. 3:09-0175 <br> Judge Trauger |

_____

| | |
|---|---|
| BRUCE K. SIDDLE and SANDRA K. ) <br> SIDDLE, individually and as trustees of the ) <br> Bruce K. Siddle and Sandra K. Siddle trusts, ) <br> dated July 16, 2003, and PPCT ) <br> MANAGEMENT SYSTEMS, INC., ) <br>   ) <br>   Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> CONNECTGOV, INC., *et al.*, ) <br>   ) <br>   Defendants. ) | Case No. 3:09-1137 <br> Judge Trauger |

## MEMORANDUM

These are two related, but not consolidated, cases. As can be seen herein, the overlap in the relevant facts dictates that it is in the interest of judicial economy to address the pending motions in these two cases in one opinion. In case number 3:09-175 (*Siddle I*), pending before

1

the court are: (1) Defendant Linda Cooper's Motion for Summary Judgment (Docket No. 304), (2) a Motion of Lee F. Booth to Dismiss for Failure to State a Claim Upon Which Relief May be Granted (Docket No. 305), (3) Defendant George V. Crawford, III's Motion for Summary Judgment (Docket No. 306), and (4) Defendant Roy W. Oaks's Summary Judgment Motion on Release Defense (Docket No. 310).

In case number 3:09-1137 (*Siddle II*), pending are: (1) Defendant Gullett, Sanford, Robinson & Martin, PLLC's (GSRM's) Motion for Summary Judgment (Docket No. 190), (2) Defendant Lattimore Black Morgan & Cain, PC's (LBMC's) Summary Judgment Motion on Release Defense (Docket No. 192), (3) Defendant ConnectGov, Inc.'s Motion for Summary Judgment (Docket No. 202), (4) Defendant Jack H. Dalton's Motion for Summary Judgment (Docket No. 204), (5) the Motion for Summary Judgment filed by Defendants DC Investment Partners, LLC, Four Corners Capital, LLC, Lynview Partners, LLC d/b/a Pharos Homeland, LLC, Pharos Capital Partners, LP, Pharos Homeland Financial, LLC, and Michael W. Devlin (collectively, the "Pharos Defendants") (Docket No. 207), and (6) Defendant Joseph F. Johnson, Jr.'s Motion for Summary Judgment (Docket No. 208).[1]

---

[1] In *Siddle II*, the Pharos Defendants have also filed a Motion to Strike the Declaration of Bruce K. Siddle (Docket No. 247). As he did in defending earlier summary judgment motions in *Siddle I*, Mr. Siddle, in both *Siddle I* and *Siddle II*, has filed an exceptionally lengthy affidavit (*See Siddle I* Docket No. 323 Ex. 14; *Siddle II* Docket No. 238 Ex. 14 – the affidavits are identical) in an attempt to defend these motions here. As before, the affidavit largely restates the broad and generalized allegations in the Second Amended Complaint in *Siddle I* and only occasionally and vaguely cites to documents in the record. (*Id.*) Indeed, the affidavit here appears to be, in essence, a copy of the declaration that the plaintiffs filed in earlier summary judgment briefing in *Siddle I*. As before, the court fully agrees with the defendants that the allegations in the affidavit largely appear to not be based on personal knowledge, are often conclusory, include improper legal conclusions and hearsay, and rely on unauthenticated documents. (*Siddle II* Docket No. 247 at 2.). Despite these obvious flaws, in the interests of justice, the court has, once again, fully reviewed the filing and the documents attached. As

For the reasons discussed herein, all of these dispositive motions will be granted, and all of these defendants will be dismissed from this litigation.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The plethora of pending dispositive motions was naturally spawned by the court's January 25, 2010 Memorandum and Order in *Siddle I*. (*Siddle I* Docket Nos. 285-86.) In that opinion, the court found that two release agreements, one signed in April 2006 (the "April Agreement") and a Stock Purchase Agreement ("SPA") signed in October 2006, barred the dense and complicated claims of financial malfeasance at the Homeland Security Company (HSC) raised by the plaintiffs against former HSC Board Member Doctor R. Crants, Jr. ("Crants") and his son/HSC interest holder Doctor R. Crants, III (collectively, "the Crants defendants") in *Siddle I*. (*Id.*)

Specifically, in the April Agreement, Siddle, who was a long-time member of the Board of Directors at HSC, purported to "remise[], release[], and forever discharge[] Crants and HSC, jointly and severally, and its and their managers, directors, officers, employees, shareholders, agents, representatives, attorneys, and certified public accountants, from any and all actions, claims and demands which he may have arising from any act, inaction, error, omission, damage, breach, default, right, duty or obligation that may have existed or occurred prior to the date of this Agreement, whether such actions, claims and demands are currently known or unknown, disclosed or undisclosed, or are accrued or unaccrued." (*Siddle I* Docket No. 227 Ex. 27.) HSC

---

before, the documents attached to the affidavit do not bear out the broad and sensational allegations in the affidavit or in the plaintiffs' briefing. As striking the affidavit would not make a difference in the ultimate result of this proceeding, the court will deny the Motion to Strike as moot.

and Crants similarly released all such claims against Siddle (and his associates) and each other (and each other's associates). (*Id.*)

In the SPA, Siddle again agreed to release Crants and "his agents, representatives, attorneys, and certified public accountants, from any and all actions, claims and demands" arising from "any act, inaction, error, omission, damage, breach, default, right, duty, or obligation that may have existed or occurred prior to the date of this Agreement . . . whether such actions, claims and demands are currently known or unknown, disclosed or undisclosed, or are accrued or unaccrued." (*Siddle I* Docket No. 227 Ex. 32.) Again, HSC and Crants also made the same release of Siddle and his associates. (*Id.*)

In the January 25, 2010 Memorandum, the court, in significant detail, recounted the factual circumstances and events that led up to the signing of the two releases. These events included: (1) Siddle's 2005-2006 investigation of the Crants defendants' alleged financial mismanagement at HSC, which was undertaken by counsel retained by Siddle, (2) the complicated stock transfers that occurred in conjunction with both releases, and (3) the post-release activities of the parties, which indicated that Siddle and the plaintiffs, in large part, received the benefit of the bargain in conjunction with signing the release agreements and that Siddle ratified the release agreements. (*Siddle I* Docket No. 285 at 2-8.)

In the Analysis section, the court recognized the presumptive force of the release agreements under Tennessee law. (*Id.* at 9-10.) The court also recognized that the Second Amended Complaint was focused upon alleged financial improprieties undertaken by the Crants defendants and associated entities prior to the time that the releases were signed, and, therefore, facially, the releases appeared to bar the claims against the Crants defendants. (*Id.* at 9-10.)

4

The court then went on to consider the plaintiffs' various affirmative defenses (duress, fraudulent inducement, and failure of consideration) that allegedly precluded enforcement of the release agreements. (*Id.* at 9-20.) The court recognized that, while the plaintiffs' voluminous filings were long on fiery rhetoric, they were short on support for these affirmative defenses, and the court found that none of these affirmative defenses barred enforcement of the release agreements. (*Id.*) The court went on to conclude that, for various reasons, the release agreements (combined with the complaint allegations) barred the claims of all plaintiffs, not just Mr. Siddle, who had actually signed the release agreements. (*Id.* at 20-23.)

Providing support for the defendants' arguments here, the court also stated that "[c]learly, the unambiguous intent of both the April Agreement and the SPA was to permanently end the prospect of litigation between Siddle, Crants, HSC, and *associated entities.* . . . It is clear from the plain language of the releases that the parties intended to short-circuit all future litigation between them for conduct that occurred prior to October 27, 2006, however the claims in that litigation would have been expressed." (*Id.* at 19)(emphasis added). The court went on to grant the Crants defendants' motions for summary judgment and to dismiss all claims against them. (*Siddle I* Docket No. 286.)

Shortly after the court issued its ruling in *Siddle I*, the court stayed both *Siddle I* (Docket No. 288) and *Siddle II* (Docket No. 176) so that the parties in these cases could discuss how they wished to proceed. Indeed, given that the remaining defendants in *Siddle I* and *Siddle II* are closely associated with the Crants defendants and HSC and that the allegations against those defendants focus upon the same financial mismanagement, it appeared possible for a time that the parties would simply stipulate to the *applicability* of the release agreements to the remaining

5

parties, and then the plaintiffs would appeal the issue of the *enforceability* of the release agreements. (*See Siddle I* Docket No. 293.) This path was clearly not followed, and, based upon the wishes of the parties, the court set a briefing schedule for the various defendants here to file summary judgment motions on the release agreements, with the cases remaining stayed for other purposes. (*See Siddle I* Docket No. 300; *Siddle II* Docket No. 180.)

Providing widely varying levels of detail and argument, the defendants in the motions here all argue that they too fall within the scope of the release agreements. That is, based upon the allegations in the Second Amended Complaint, the remaining defendants in *Siddle I*, Linda Cooper (attorney for HSC and Crants), Lee Booth ("associate" of HSC and Crants), George Crawford ("HSC's outside corporate counsel and Crants' personal attorney"), and Roy Oaks ("certified public accountant" for HSC and Crants), all claim that they are covered by the plain text of the two release agreements and, under the court's January 25, 2010 Memorandum and Order, they are entitled to summary judgment on the release issue. (*See* Docket No. 201 at 11-14.)

In *Siddle II*, the arguments are similar. The essence of the Complaint in *Siddle II* is that, through dozens of transactions from 2002 to 2005, Crants funneled millions of dollars from HSC (a company in which Siddle had a controlling interest) to a series of entities that Crants, along with his "non-Siddle" associates, controlled, such as ConnectGov and Four Corners Capital. (Docket No. 2 at 10-21.)

Based upon their close associations with Crants and HSC, the remaining defendants in *Siddle II* have all moved for summary judgment on the ground of release. Indeed, GSRM (employer of Mr. Crawford) and LBMC (employer of Mr. Oaks) argue that they are entitled to

the same disposition as their employees, as they are only sued based upon the fact that they are Crawford's and Oaks's employers. (Docket No. 190 Ex. 1 at 5; Docket No. 192 Ex. 1 at 1; Docket No. 2 at 7.) ConnectGov, Inc. and the entities that comprise the "Pharos defendants" point to, among other things, the allegation in the Complaint that they are "owned, managed, or controlled by, or associated with Crants." (*Id.* at 6.) And the remaining individual defendants in *Siddle II* (Johnson, Devlin, Dalton) point out that they are also alleged to be individuals who, along with Crants, managed the entities that were "owned, managed, or controlled by, or associated with Crants." (*Id.* at 8-9.)[2]

As noted above, the detail of each defendant's briefing ranged widely. That is, while some defendants simply pointed to the releases and the court's January 25, 2010 Memorandum, other defendants provided detailed briefs and lengthy statements of fact that fully recounted the heavily trodden ground that is the factual background of this case. Despite their varying level of detail, all of the defendants' briefing re-argued the same point – that is, that the pertinent allegations concern conduct covered by the release agreements and, therefore, the release agreements bar the claims here. Where the defendants provided a detailed account of the events surrounding this dispute, the plaintiffs responded by asserting the same disagreements (and relying on the same documents) regarding the course of events that were discussed in the January 25, 2010 Memorandum. (*See e.g. Siddle I* Docket No. 321, *Siddle II* Docket No. 224-225.)

It is certainly not necessary to recite all of that briefing here. The relevant facts of this

---

[2] ConnectGov also asserts a lack of standing defense that it is not necessary to reach here. (Docket No. 203 at 9-10.)

dispute remain unchanged and have been discussed, in considerable detail, in the court's previous two Memoranda. (*Siddle I* Docket Nos. 180 and 285.) In light of the court's previous Memorandum and Order that found that the April Agreement and SPA were fully enforceable to bar the claims in this litigation, the only pertinent issue for this round of briefing is whether the defendants who advance dispositive motions here fall within the scope of the release agreements.

## ANALYSIS

In this round of briefing, the remaining defendants in these two closely related cases argue that they fall within the scope of a pair of release agreements that the court has previously determined to be fully enforceable, and that, therefore, they are entitled to summary judgment and dismissal. The plaintiffs have submitted responses in both cases.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

8

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    *Siddle I*

The four remaining defendants in *Siddle I,* that is, Linda Cooper, Roy W. Oaks, Lee Booth, and George Crawford have all moved for summary judgment on the release issue.[3] As indicated above, the Amended Complaint alleges that all four defendants assisted Crants and HSC in a professional capacity, as legal counsel, certified public accountant, and assistant. (Docket No. 201 at 12-14.) Arguing that they are "managers, directors, officers, employees, shareholders, agents, representatives, attorneys, [or] certified public accountants" under the April Agreement and "agents, representatives, attorneys, [or] certified public accountants" under the SPA, these defendants argue that the release agreements (already found to be fully enforceable to bar all claims in this litigation against the Crants defendants) clearly bar the plaintiffs from pursuing the claims against them here. (Docket No. 304 at 2; Docket No. 305, Docket No. 306

---

[3]Lee Booth, proceeding *pro se,* technically moved to dismiss under Rule 12(b)(6), while incorporating and relying upon the entire record in support of his motion and attaching an exhibit. (Docket No. 305.) Given that the briefing schedule directed these remaining parties to file motions for summary judgment, the fact that Booth is relying on material outside of the pleadings, and that *pro se* filings are to be read liberally to do justice, the court interprets his motion as a Motion for Summary Judgment and will evaluate it on that ground.

Ex. 1 at 4, Docket No. 310 Ex. 1 at 1.)

In response, rather than addressing any possible basis for the non-applicability of the releases to the claims against these defendants here, the plaintiffs essentially re-assert their prior arguments from briefing on the Crants defendants' Motions for Summary Judgment in *Siddle I*. (Docket No. 323.) That is, in the factual section, putting their own furious spin on the events that led up to and immediately followed the signing of the release agreements, the plaintiffs argue, again, that these releases were not supported by consideration and that the stock certificates provided to the plaintiffs in conjunction with signing the releases were "fake, phony, and sham[s]." (*Id.* at 1-4.) In the January 25, 2010 Memorandum, the court carefully walked through the record as to these events and concluded that the record did not support the plaintiffs' argument and determined that, either way, other consideration supported the release agreements. (*See* Docket No. 285 at 15.)

Next, the plaintiffs imply that summary judgment is inappropriate at this time because there has not been "sufficient time for discovery." (Docket No. 323 at 5, 8.) As Crawford points out in his reply, a request for additional time for discovery is properly made by counsel, pursuant to Fed. R. Civ. P. 56(f), in an affidavit that explains the need for additional discovery. (Docket No. 333 at 3-4; Fed. R. Civ. P. 56(f)). Where, as here, the plaintiffs' request for additional discovery is nothing more than a "nebulous assertion," it is not inappropriate for the court to grant the motion for summary judgment. *Nuchols v. Berrong*, 268 Fed. Appx. 414, 417-18 (6th Cir. 2008). That is, here, by merely mentioning the notion in their brief, the plaintiffs have simply implied that additional discovery should be conducted, but they have provided no indication as to why the voluminous record that has already been built in this case is not

10

sufficient or any explanation as to what they hope to uncover in additional discovery. To the court, the burden to provide some credible rationale for delaying summary judgment to conduct additional discovery should be particularly strong where, as here, the defendants put forth release agreements that demonstrate that they bargained with the plaintiff to avoid exactly this type of litigation and its substantial related costs. *See Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 11-14 (1st Cir. 1997).[4] The plaintiffs' "nebulous assertion" is not sufficient to forestall a decision on these motions.

The "argument" section of the plaintiffs' brief is, again, simply another opportunity for the plaintiffs to re-assert arguments that the court has fully considered and rejected in the previous round of briefing. Primarily, the plaintiffs argue that they have a viable RICO claim because of the pledged nature of the stock certificates that were used as consideration for both the April Agreement and the SPA. (Docket No. 323 at 8-22.) As indicated above, this argument was thoroughly briefed before; the court considered it and discussed it in detail in the January 25, 2010 Memorandum before concluding that the fact that the shares (at one time) acted as security for a First Tennessee bank loan taken by Crants did not indicate that the releases were not enforceable. (Docket No. 285 at 13-15, 17-18.) Re-launching the same argument does not change the result.

In sum, rather than addressing the pertinent issue of whether any of these defendants is

---

[4]In this section, the plaintiffs also imply that the fact that there were "fiduciary" relationships involved here should impact the court's interpretation of the release agreements. (Docket No. 323 at 6.) The court addressed the plaintiffs' vague "fiduciary" arguments in the previous Memorandum, finding that the "abuse of power" argument was misplaced in light of the fact that Siddle was represented by counsel throughout the process of investigating Crants, signing the relevant releases, and ratifying them. (*See* Docket No. 285 at 16.)

11

not covered by the release agreements, the plaintiffs have simply re-argued that the releases are not enforceable at all. The court has considered these exact arguments before and ruled upon them. The plaintiffs continue to employ bold argument and skewed facts that are simply not supported by the record, but they make no real attempt to engage the arguments of the defendants or even the reasoning in the court's previous Memorandum.[5] The plaintiffs have failed to show that these defendants who, facially, fall within the scope of the release agreements are somehow excepted from its enforceability. Therefore, the court will grant the four pending dispositive motions in *Siddle I* and dismiss the claims against defendants Cooper, Booth, Oaks, and Crawford.[6]

---

[5]For instance, in the Memorandum, the court, relying upon documents in the record, concluded that, in late October 2006, Crants paid First Tennessee Bank to release the lien on his shares. HSC, pursuant to Siddle's authorization, received those shares and then re-issued the company's original 1,000,000 shares of stock, with 300,000 going to the plaintiffs and the rest going to other investors. (Docket No. 285 at 14-15.) Given that Siddle controlled HSC at the time, these transactions indicate that the plaintiffs did, in essence, receive the benefit of the bargain envisioned by the SPA. Despite this, the plaintiffs, in conclusory fashion, simply argue that "Crants did not transfer . . . the promised [] shares of HSC to Siddle pursuant to the [SPA]." (Docket No. 323 at 20.) The cited documentary support for this proposition, however, simply does not meaningfully support the statement. Indeed, the documents merely indicate that (at one time prior to the closing of the SPA) First Tennessee Bank held a lien on the shares and that the Siddle Family Trust received 300,000 shares of stock after the signing of the SPA. (Docket No. 323 Ex. 7, 12.) This is merely one example of the plaintiffs' pattern of using broad allegations and conclusory statements that are not supported by the documents cited.

[6]As discussed in the previous Memorandum, while the vast majority of the allegations in the plaintiffs 115-page Second Amended Complaint concern conduct that occurred prior to the closing of the SPA on October 27, 2006, a small number of the allegations concern conduct that occurred after that date, such as the allegation that Booth "agreed to injure plaintiffs' business and property interests through harassment, oppression and intimidation." (Docket No. 201 at 13.) The court previously concluded that these bare, entirely unsupported, allegations, which are seemingly divorced from any substantive claim in light of the release agreements, did not warrant denying the defendants' motions for summary judgment. (Docket No. 285 at 15-16.) Here, once again, the court reviewed the voluminous filing attached to Siddle's affidavit and found no documentary support for the bare allegations that the alleged fraud (of any defendant in

12

**III.** *Siddle II*

The analysis required in *Siddle II* is similar. As discussed above, the plaintiffs' allegations in *Siddle II* also rest upon Crants-directed financial mismanagement at HSC from 2002-2006, but *Siddle II* focuses upon the entities and individuals who worked with Crants to allegedly funnel money from HSC to a variety of related entities in which Crants, but not Siddle, had a controlling stake. (*See* Docket No. 2.) In addition to generally denying the Complaint allegations, several defendants, that is, GSRM, LBMC, ConnectGov, Jack Dalton, Joseph Johnson, and six additional defendants, collectively known as the "Pharos defendants," have all moved for summary judgment on the ground of release. As explained in the note below, granting these motions for summary judgment would, in essence, end *Siddle II*.[7]

---

*Siddle I* or *Siddle II*) continued after the closing of the SPA.

[7]*Siddle II* is complicated by the fact that the plaintiffs sued a plethora of entities, many with very similar names. The court has reviewed the docket to determine whether, in one way or another, all remaining named defendants in this case are covered by the pending motions for summary judgment, and a brief discussion of the defendants who have not explicitly asserted a motion for summary judgment is appropriate. While the Pharos defendants' motion for summary judgment is not explicitly asserted by defendants Lynview Capital, Pharos Homeland, Pharos Homeland Financial, and Pharos Homeland LLC, the Pharos defendants assert that the first three entities do not exist and that Pharos Homeland LLC is a trade name of Lynview Partners, LLC, which does move for summary judgment. (Docket No. 214 at 2.) The plaintiffs do not challenge these points, and, therefore, dismissal of this action as a whole will not be forestalled by the fact that these, apparently non-existent, entities have not filed a dispositive motion. Also, while the docket lists Crants III as a defendant in *Siddle II*, this seems inappropriate, as he is listed as a "non-party conspirator" in the *Siddle II* Complaint. (Docket No. 2 at 4.) Either way, the court has previously found that Crants III is covered by the release agreements and he would, therefore, be entitled to dismissal in *Siddle II* regardless. Finally, the Complaint and docket reflect a defendant named "Smartdm Holding, Inc.," which is not represented by counsel and has not made an appearance in this case. Apparently, two "alias" summons were issued for this defendant with executed summonses being returned both times, while this case was pending in the Southern District of Illinois. (Docket Nos. 33, 60, 74, 80.) It is not readily apparent from the

13

As discussed above, the defendants in *Siddle II* all argue that their close association with Crants and HSC puts them within the scope of the release agreements. That is, GSRM and LBMC argue that, through their employees, they directly fall within the scope of the agreements as attorneys and certified public accountants for HSC and Crants. (Docket No. 190 Ex. 1 at 5; Docket No. 192 Ex. 1 at 1.) Meanwhile, the entity defendants and the individuals (Dalton, Johnson, and Devlin) who worked for them (and HSC) are all alleged to be, among other things, "owned, managed, or controlled by, or associated with Crants." (Docket No. 2 at 6-9.) That status, these defendants argue, places them within the scope of the release provisions as "agents and representatives" of Crants, as well as, in some cases, also being employees and shareholders of HSC and, therefore, "doubly" covered by the release. (*See* Docket No. 203 at 8, Docket No. 216, Docket No. 209 at 6-7, Docket No. 214 at 14-18.)

Again, given the court's conclusion in the January 25, 2010 Memorandum that the releases were enforceable and that "the unambiguous intent of both the April Agreement and the SPA was to permanently end the prospect of litigation between Siddle, Crants, HSC, and associated entities," regarding financial mismanagement at HSC during the relevant time period, the challenge for the plaintiffs in this round of briefing was to provide some authority or

---

executed "alias" summonses that this defendant actually received notice of this case through service of process. Either way, the Complaint makes no specific allegations against Smartdm and every indication from the Complaint is that this company, which was alleged to be "owned, managed, controlled by, or associated with Crants," among others, would be covered by the release agreements. (Docket No. 2 at 6.) Moreover, it has been nine months since the second executed alias summons was filed, and Smartdm has neither made an appearance nor answered the Complaint. Assuming that Smartdm was properly served, the plaintiffs' failure to move for default in this context further demonstrates the probability that there are no meritorious claims against Smartdm. Therefore, to the extent that there are any claims pending against Smartdm, they will be dismissed through the accompanying Order that dismisses this case.

14

evidence to indicate that these defendants did not fall within the scope of the release agreements. (*Siddle I* Docket No. 285 at 19.) Once again, the plaintiffs have fallen short.

Indeed, the plaintiffs' briefing here entirely re-hashes the arguments raised in the two rounds of summary judgment briefing in *Siddle I*. The plaintiffs argue that not allowing the plaintiffs to pursue their RICO claims "undermines the intent of Congress" in giving this court jurisdiction over federal causes of action. (Docket No. 223 at 1-3.) Next, the plaintiffs re-argue that the "releases are the product of the fear of economic harm, coercion, under influence, duress, and deception." (*Id.* at 3.) In this section of the brief, the plaintiffs provide another case law overview of duress and failure-of-consideration law and more conclusory argument before concluding the section with the question, "[c]ould Al Capone simply have had his victims sign releases so that everyone in his gang would escape civil liability for their crimes?" (*Id.* at 5.)

Next, the plaintiffs turn to the issue of ratification. (*Id.* at 6.) In the January 25, 2010 Memorandum, the court, relying upon several documents in the record that refuted the plaintiffs' allegations and demonstrated that Siddle had actively sought to bring about the SPA, concluded that the record did not support the plaintiffs' duress claims. (*Siddle I* Docket No. 285 at 10-11.) Moreover, the court concluded that, because Siddle's post-SPA conduct was consistent with the terms of that agreement, even if the plaintiffs could somehow establish duress, the contract would not be set aside on that ground because the plaintiffs ratified the agreement by not quickly moving to set it aside. (*Id.* at 11-12.)

The plaintiffs' ratification challenge here is simply a re-assertion of their previous arguments that Crants' funneling of money to other entities was a massive fraud that suddenly revealed itself well after the releases were signed. (Docket No. 223 at 6-7.) This, of course, is

15

entirely inconsistent with the several-month investigation into financial mismanagement and related party transactions that Siddle, through retained counsel, conducted prior to signing the April Agreement. The court decided the duress/ratification issue previously, and the plaintiffs have brought forth no evidence to suggest that the court wrongly decided this issue.

Next, in addition to providing yet another legal overview of duress and fraudulent inducement law and more conclusory allegations, the plaintiffs argue that the release agreements cannot bar the RICO claims here because those claims were not contemplated at the time that the releases were signed. (*Id.* at 7-14.) Again, the court, in the previous Memorandum, explicitly considered the specific language of the relevant release agreements in the context of Tennessee law and concluded that, given that the unambiguous intent of the agreements was to "permanently end the prospect of litigation" between these parties and their associates "all claims for damages arising out of the alleged financial malfeasance at issue were within the contemplation of the parties at the time that the releases were entered into." (*Siddle I* Docket No. 285 at 19-20.) Going further, the court stated that, "under Tennessee law, the fact that Siddle was unaware that he might [specifically] have a RICO claim . . . is not the point. It is clear from the plain language of the releases that the parties intended to short-circuit all future litigation between them . . . however the claims . . . would have been expressed." (*Id.*) The plaintiffs are simply re-arguing a settled point in this litigation.[8]

---

[8]At least the plaintiffs do cite Sixth Circuit and Tennessee authority in support of their argument on this issue. However, this law is not particularly helpful to their position. The result in these cases hinges upon the intent of the parties in executing the release, that is, whether the parties intended to release the claims at issue. *See Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995); *Am. International v, International Forging Equip. Corp.*, 982 F.2d 989, 996 (6th Cir. 1993); *Richland Country Club v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. App. 1991). In the previous Memorandum, the court squarely focused upon the intent of the parties as

16

The final *eight pages* of the plaintiffs' brief is a discussion of the basis for the plaintiffs' standing under RICO, although it also includes a basic request for the court to reverse its holding in the January 25, 2010 Memorandum in *Siddle I*. (*Id.* at 14-21.) Given the prior rulings of the court and the arguments by these defendants here as to the applicability of the release agreements, this extended argument is misplaced. Suffice it to say that the plaintiffs have offered nothing to rebut the arguments of the defendants here that, under the settled ruling that the releases are enforceable, the releases are applicable to those defendants. Therefore, the defendants' motions for summary judgment will be granted and *Siddle II* will be dismissed.

## CONCLUSION

For the reasons discussed herein and in the court's January 25, 2010 Memorandum in *Siddle I*, all pending dispositive motions filed by the defendants in *Siddle I* and *Siddle II* will be granted. As there are no viable claims remaining against any defendants in *Siddle II*, that case will be dismissed. In *Siddle I*, Crants III has a counterclaim for attorney's fees pending against the plaintiffs, and, pursuant to a recent Order, the plaintiffs will have 30 days from the date of the accompanying Order to file a response to that counterclaim. (Docket Nos. 299 and 334.) As all matters in *Siddle I*, other than the attorney's fees counterclaim, appear to be resolved, there is no "just reason" for the court to delay entering a final judgment in favor of all defendants in *Siddle I* under Fed. R. Civ. P. 54(b). Additionally, the court is inclined to defer ruling on the attorney's fee issue until after the resolution of any appeal of the court's ruling in *Siddle I*.

---

demonstrated by the broad language of the release agreements and found that the parties' intent was to bar the present rounds of litigation that, in all substance, seek to litigate issues of financial malfeasance at HSC during the time period prior to when the releases were signed.

17

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

18